## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASON REYER,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 15-1300** |
| | : | |
| **SAINT FRANCIS COUNTRY HOUSE, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                                                         **March 20, 2017**

### MEMORANDUM OPINION

Jason Reyer brings this employment discrimination action against Saint Francis Country House, 1412 Lansdowne Operating, LLC and the Archdiocese of Philadelphia, his former employers, for violations of the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA").

According to Reyer who suffers from chronic obstructive pulmonary disease ("COPD"), emphysema, other respiratory conditions and related complications, Defendants failed to accommodate his disability, discriminated against him on the basis of his disability, interfered with his FMLA rights and ultimately, terminated his employment because he requested accommodations and took FMLA leave.

Reyer brings interference and retaliation claims under the FMLA as well as discrimination, failure to accommodate and retaliation claims under the ADA. Defendants have moved for summary judgment on all claims. As many genuine issues of material fact exist, Defendants' motion will be denied.

I.      **FACTUAL RECORD**[1]

Saint Francis Country House is a nursing care facility owned and operated by the Archdiocese at all times prior to Reyer's termination. The Archdiocese sold Saint Francis Country House to Center Management Group, LLC in November of 2014. As of the date of the sale, all existing employees were terminated. (Defs.' Statement of Undisputed Material Facts ¶¶ 1, 4, 8.)

**A.  Reyer's Employment at St. Francis**

St. Francis had three separate grades of Maintenance Workers: I, II, and III. Jason Reyer was hired by Saint Francis Country House in October 2004 as a Maintenance Worker II. On August 25, 2005, Reyer was promoted to a Maintenance Worker III position. Throughout his employment Reyer was supervised by a Plant Operations Manager, John Hedges. (Id. at ¶¶ 15, 22, 31.)

Under a heading titled "Purpose of Your Job Position," the description for the Maintenance Worker II and III position states:

> The primary purpose of your job position is to perform the duties necessary to keep the structure of the facility in good repair. These duties include the repair and maintenance of machinery and medical equipment in accordance with diagrams, schedules, operation manuals and manufacturer's specifications, using power tools and precision measuring and testing instruments.

The job description also identified certain "physical and sensory requirements," including (i) "must be able to move intermittently throughout the work day;" (ii) "must be in good general health and demonstrate emotional stability;" and (iii) "must be able to lift in excess of 50 pounds, push, pull and move residents, equipment, supplies, etc., up to 200 pounds." (Defs.' Mot., Ex.

---

[1] The facts set forth in this section are undisputed unless otherwise indicated.

10.) Reyer signed and returned a form acknowledging that he received the job description for the Maintenance Worker position. (Id.)

When asked about the job duties of Maintenance Worker at St. Francis, Hedges explained that they "would oversee their units or the building and handle any issues that might arise, whether it be moving beds, unclogging sinks, toilets, light bulbs being out, any emergency repairs, walls needed repairing, if there was project work, fixing wheelchairs, painting. This list could possibly go on forever." Hedges also testified that lifting items in excess of fifty pounds was a "true assessment" of the Maintenance Worker position. (Defs.' Statement of Undisputed Material Facts ¶ 31; Defs.' Mot. Ex. 5, Hedges Dep., 30:24 – 31:11, 83:17-83:23.)

If a Maintenance Worker was unable to come to work on a particular day, that work would be divided between the other maintenance workers on site that day. During the relevant time period, four or five Maintenance Workers were employed on-site. (Defs.' Statement of Undisputed Material Facts ¶¶ 24, 33.)

**B.  St. Francis' Leave Policies and Notice of FMLA Rights**

St. Francis' employee handbook states that "[u]pon request, an eligible employee may receive a maximum of twelve (12) weeks of family and medical leave in any twelve (12) month period." It further explains that if FMLA leave "was taken because of the employee's own illness, documentation from the employee's physician that the employee is able to return to work is required." It also states that "for the purpose of determining eligibility for family and medical leave, a 'twelve (12) month period' refers to the twelve months immediately preceding the start of the request leave. In no case will an employee receive family and medical leave for a period in excess of twelve (12) consecutive weeks." (Defs.' Mot., Ex. 1.)

St. Francis' employee handbook also informs employees that they may take up to a six month "medical" leave of absence. The handbook specifies that if a period of leave is "covered by the family and medical leave policy" then the six month leave of absence will "apply only to those periods beyond the twelve (12) weeks of the family leave policy." (Id.) Reyer signed a form acknowledging receipt of the employee handbook on October 6, 2004. (Defs.' Statement of Undisputed Material Facts ¶ 17.)

Upon his hire, Reyer also received a notification regarding workplace discrimination. In 2009 and 2010, Reyer received a form setting forth "Employee Rights and Responsibilities under the Family and Medical Leave Act."[2] (Defs.' Statement of Undisputed Material Facts ¶ 16; Defs.' Mot., Ex. 9.)

### C.  Reyer's FMLA Leave

In 2011, Reyer began treatment for chronic obstructive pulmonary disease ("COPD") and emphysema with Dr. Thomas Prestel, a pulmonologist. Shortly thereafter, Reyer notified Saint Francis that he would be taking intermittent FMLA leave and provided a certification from his primary care physician. His request was approved and he took intermittent leave during the 2011 calendar year. (Defs.' Statement of Undisputed Material Facts ¶¶ 36-37, 39; Defs.' Mot., Exs. 15, 16.)

In April of 2012, Reyer requested and received permission to take FMLA leave to care for his ailing father. In December of 2012, Reyer retroactively requested FMLA leave for a week

---

[2]  In their "Statement of Undisputed Material Facts," Defendants state that Reyer received "FMLA documentation throughout his employment." (Defs.' Statement of Undisputed Material Facts ¶ 16) (emphasis added). In support of this assertion, Defendants cite to documents that demonstrate Reyer received two notices of his rights under the FMLA dated February 2, 2009 and February 2, 2010. As Defendants do not cite to any evidence demonstrating that Reyer received "FMLA documentation" during the nearly four year time period between February 2, 2010 and his termination in December of 2013, Defendants' statement that he received FMLA documentation throughout his employment is unsupported by the record.

4

long absence due to the fact that he had pneumonia. In support of his request, he submitted a certification from his primary care physician. His request was approved. (Defs.' Statement of Undisputed Material Facts ¶¶ 41-44 ; Defs.' Mot., Ex. 17, 18.)

In January of 2013, Reyer submitted a third FMLA certification from a physician in support of his request for intermittent FMLA leave to deal with his COPD and emphysema. This request was also approved. (Defs.' Statement of Undisputed Material Facts ¶¶ 47, 49; Defs.' Mot., Ex. 19.)

Unrelated to his COPD and emphysema, Reyer was absent from work for twenty one days in April and May of 2013 in connection with a hernia repair operation. Reyer did not submit FMLA paperwork for this absence and instead St. Francis allowed Reyer to take "personal time" and return to work after he had recovered. (Defs.' Statement of Undisputed Material Facts ¶¶ 50-51.)

On August 13, 2013, Reyer emailed Cindy Kersey, the Director of Human Resources at St. Francis, asking "how many [FMLA days he had] already used and how many days are remaining." Kersey did not respond to this email until shortly after his termination. (Pl.'s Resp., Exs. J; Ex. A, Reyer Dep. 57:4-7.)

Reyer was then out of work again from August 15, 2013 to August 30, 2013 to undergo a bronchoscopy and further evaluation of his lungs. He returned to work for five days but then again was absent from September 20, 2013 to September, 25, 2013 in order to undergo a second bronchoscopy. (Defs.' Statement of Undisputed Material Facts ¶¶ 53, 55-56.)

Reyer returned to work for several days but then requested and received approval for an "extended" leave beginning on September 30, 2013. (Defs.' Statement of Undisputed Material Facts ¶¶ 56-57; Pl.'s Resp., Ex. B, Kersey Dep. 41:12-42:5.)

Following a conversation with Kersey, Reyer completed the "employee portion" of long-term disability paperwork. In that paperwork which he dated October 1, 2013, Reyer stated that September 28, 2013 was the date on which he became "totally disabled." On November 1, 2013, Dr. Prestel completed the "attending physician portion" of the paperwork and indicated that Reyer was unable to climb, balance, stoop, kneel, crouch or crawl. Under a space for "extent of disability," Dr. Prestel also wrote "last day able to work 9/29/13." Although Reyer returned the completed paperwork to Kersey, Reyer was "somewhat reluctant" about applying for disability and instructed Kersey not to submit his claim. As such, Reyer's completed application was not submitted. (Defs.' Statement of Undisputed Material Facts ¶¶ 61-66, 68, 71; Defs.' Mot. Ex. 29.)

In September or October, Reyer developed a significant lung infection. On November 11, 2013, Dr. Michael Kimzey, an infectious disease specialist, inserted a peripherally inserted central catheter ("PICC") in Reyer's arm to aid in the delivery of antibiotics. (Defs.' Statement of Undisputed Material Facts ¶¶ 74, 76.)

### D.  Information Regarding Reyer's Ability to Return to Work

In a note dated November 11, 2013, Dr. Kimzey stated:

> This letter is to confirm that Jason Reyer may return to work while undergoing treatment. His only restriction is that he may not lift anything over 5 pounds because of the PICC line that is in his arm so that he may self-administer his antibiotic for the next 60 days.

(Pl.'s Resp., Ex. K.) Reyer testified that he believed he provided this note to Kersey "immediately" after he received it. (Pl.'s Resp. Ex. A, Reyer Dep. 132:5-12.)

In a subsequent note dated November 25, 2013, Dr. Kimzey stated Reyer "may return to work on December 9th, 2013. He is restricted to not lifting more than 5 pounds because of the

PICC line in his arm." (Defs.' Mot. Exs. 34, 35.) Reyer faxed this note to Kersey on December 3, 2013. (Defs.' Statement of Undisputed Material Facts ¶ 81; Defs. Mot. Exs. 34-35.)[3]

On December 4, 2013, Reyer emailed Kersey to confirm receipt of his "'Return to work Note' from doctor, which I faxed to you on Tuesday December 3rd." In the email, he further wrote "[t]he note states that I am able to return to work on Monday December 9th with certain medical restrictions, as listed. I will need a response prior to Monday, December 9th, to know whether to come into work on that date." On December 9, 2013, Kersey responded by way of email that she would speak with Hedges later that week about the doctor's note. (Pl.'s Resp., Ex. N.)

In addition to sending the November 11th and 25th notes from Dr. Kimzey and the above referenced email, Reyer testified that he had multiple conversations with Kersey and others at St. Francis about when he would return to work. Reyer testified that he had discussions with Kersey and Hedges about how long his PICC line would be in. (Pl.'s Resp., Ex. A, Reyer Dep. 106:21-107:17.) Reyer testified that, prior to his termination, he told Kersey that he would be able to return to work on December 9, 2013 and that he would have the five-pound weight restriction until the PICC line was removed sometime in January. (Id. at 134:2-7, 142:9-144:19.)[4]

Reyer testified that during these conversations, Defendants informed him that the notes from Dr. Kimzey did not contain adequate information regarding his ability to return to work and

---

[3] Some evidence in the record suggests that Reyer provided Kersey with the November 25, 2013 note on a separate occasion prior to the December 3, 2013 fax. The evidence, however, is unclear. Regardless, this issue does not appear to be material and, as such, I need not resolve it. For the sake of completeness, I also note that Kersey testified that she could not recall receiving the November 11, 2013 note. (Pl.'s Resp., Ex. B, Kersey Dep. 821-22.)

[4] Reyer's testimony regarding what he told Kersey about his ability to return to work without the lifting restriction is somewhat muddled. However, viewed in the light most favorable to Reyer, his testimony establishes that, prior to his termination, he told Kersey that the PICC line would be removed in January and, at that point, he could return to work without the five pound lifting restriction.

did not specify the date on which he could do so without restrictions. According to Reyer, he obtained multiple notes from Dr. Kimzey in order to address these concerns. (Id. at 102:3-104:2, 105:19-106:5.) Reyer explained that, as a result of his ability to get follow-up appointments and ongoing treatment concerns, the notes contained differing information regarding when he could return to work. (Id. at 106:8-24.)

Kersey, Hedges and Thomas Chapman, the Nursing Home Administrator, could not recall having a conversation with Reyer about when he could return to work without any restrictions. According to Kersey and Hedges, Reyer provided them with conflicting information about when he would return to work and that he continued to change his story. (Defs.' Statement of Undisputed Material Facts ¶¶ 79-81; Pl.'s Resp., Ex. B, Kersey Dep. 33:23-34:17, 82:20-83:2; Ex. F, Chapman Dep. 29:24-30:3; Ex. C, Hedges Dep. 45:4-10:14.))

### E.  Five-Pound Lifting Restrictions

Kersey testified that she did not believe that she had discussed the five-pound lifting restriction with Reyer. However, Kersey stated that she believed that she discussed the five-pound lifting restriction with Chapman and Hedges. In particular, Kersey claimed that she discussed with Hedges what tasks a Maintenance Worker could complete with such a restriction. (Pl.'s Resp., Ex. B, Kersey Dep. 47:21-8, 48:24-49:4; 50:23-51:11.)

Kersey testified that after her discussions with Chapman and Hedges and review of the Maintenance Worker job description, "it didn't seem that that was going to be a possibility for him to be able to go back into that with any kind of a restriction just due to the nature of the work that [maintenance employees] did." (Id. at 48:4-48:19.) When asked if she was familiar with the Maintenance Worker job duties, Kersey replied "I guess mostly per the actual job description. I couldn't tell you what his daily routine was and such." (Id. at 19:7-12.)

8

Hedges, however, could not recall ever having a conversation with Kersey about the five-pound lifting restriction. (Pl.'s Resp., Ex. C, Hedges Dep. 50:1-18.) Hedges and Chapman both testified that they never discussed the restriction with Reyer. (Id. at 50:15-18; Pl.'s Resp., Ex. F, Chapman 27:1-4.)

Hedges testified that if a Maintenance Worker was limited to lifting five pounds "there's a lot of things that, you know, maybe could be done but a lot of things can't be done. It's hard to say what though, you know, depending on the circumstances." (Pl.'s Resp., Ex. C, Hedges Dep. 80:9-23.) However, Hedges equivocated and stated "there's a lot of things that, you know, maybe could be done but a lot of things can't be done. It's hard to say what though, you know, depending on the circumstances." (Id. at 80:19-23; 86:16-22.) Chapman Administrator testified that Maintenance Workers were required to lift more than five pounds "[e]very day, many times during the day" (Defs.' Mot., Ex. 2, Chapman Dep. 35:2-5.)

Contrary to Hedges and Chapman's testimony, Reyer testified that he could have performed the following Maintenance Worker tasks with the five-pound lifting restriction in place: taking inventory of supplies and materials, sweeping floors, folding laundry, changing batteries in chair and bed alarms, covering security guard shifts and testing faucets and toilets. (Pl.'s Resp., Ex. A, Reyer Dep. 111:-10-113:17, 178:1-19.)

Reyer testified that after he bruised his ribs in 2010 he was subject to a no-lifting restriction and that, during the pendency of that restriction, Reyer was permitted to fold laundry for a "few days." Reyer also testified that, following a bronchoscopy, he also had a "prior lifting restriction" of twenty-five pounds between March and June of 2013. (Id. at 24:9-22, 112:7-113:22.)

### F.  Reyer's Termination

According to Reyer, on or about December 17, 2013, Kersey informed Reyer that St. Francis did not have a position available that could accommodate the five-pound lifting restriction. According to Reyer, Kersey then told him that his employment was being terminated. Reyer testified that during this conversation he informed Kersey that the restriction would be in effect for two more weeks. (Pl.'s Resp., Ex. A, Reyer Dep. 127:13-128:14.) Reyer's termination was effective December 23, 2013. (Defs.' Mot., Ex. 36.)

When asked why Reyer's employment was terminated, Kersey testified:

> Well, he had used up all of his FML time, really way exceeded that. We didn't really have any definitive information as to when he was coming back. The department had been without his help for a long period of time. There was a lot of overtime. At the same time they were – the facility was going through – I think that was probably when we got word about the impending sale, so they were trying to do a lot of different things with the building, work got behind. It was several factors, but a lot of overtime, a lot of money spent on overtime and there was not supposed to be any money spent on overtime, so it became a real burden on the company.

Pl.'s Resp., Ex. B, Kersey Dep. 31:12-32:2)

Kersey further explained that "[b]asically, [Reyer] was terminated because he had exceeded all of his [FMLA] time, we weren't sure when he was coming back and we were in kind of desperate need there." According to Kersey, prior to terminating Reyer, St. Francis had unsuccessfully attempted to hire a temporary maintenance employee. (Id. at 112:20-113:9; 37:3-12.)

When asked who made the decision to terminate Reyer's employment, Kersey testified that she, Chapman and Hedges together made the decision to terminate Reyer's employment. (Id. at 32:3-23.) Hedges, however, testified that he was not involved in the decision-making and even

10

stated that he was unaware of the reason for Reyer's termination. (Pl.'s Resp., Ex. C, Hedges Dep. 46:1-47:4.)

### G. Expiration of Reyer's FMLA leave

Kersey was responsible for keeping track of employees' use of FMLA leave and did so by "rely[ing] on payroll." She explained that the relevant "information would go from the supervisor to the payroll department." As noted above, Kersey testified that Reyer had "far exceeded the amount of FML time that he was eligible for" by December 2013 but could not remember the date on which Reyer's FMLA leave actually expired. Kersey also asserted that she was "sure at some point in time I did advise him that his time was either coming near or was exceeding, but we did work with him." Kersey testified that she could not recall whether she provided Reyer with a designation notice in connection with the FMLA leave he took in 2013. (Pl.'s Resp., Ex. B, Kersey Dep. 33:32; 37:17-:38, 42:6-22.)

Pursuant to St. Francis policy, Reyer first exhausted his accrued sick and vacation days while out on FMLA leave. A printout of the payroll records indicate that Reyer was absent approximately 169 days from January 1, 2013 to his termination on December 23, 2016. (Defs.' Statement of Undisputed Material Facts ¶ 122; Defs.' Mot., Ex. 25.) Defendants urge that these records indicate that Reyer exhausted his 60 days of FMLA leave on or about August 22, 2013.[5] (Defs.' Statement of Undisputed Material Facts ¶ 125.)

In response, Reyer contends that the "only competent evidence provided by Defendants was that Mr. Reyer's FMLA leave expired on December 23, 2013." (Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts ¶ 125.) In support of this assertion, Reyer points to the

---

[5] Defendants explain that this calculation does not take into account the twenty-one days Reyer took off in April and May 2013 related to his hernia operations because Reyer testified that those days were "personal time" not FMLA leave.

testimony of Chapman wherein he states that it is his belief that Reyer's FMLA leave expired on December 23, 2013. When asked how he knew this, Chapman explained that he thought he saw this information on "some documentation." (Pl.'s Resp., Ex. F, Chapman Dep. 31:19-23.)[6]

Reyer explained that he did not have a clear understanding of how FMLA leave worked which was why he "consistently kept in contact with HR." Reyer further testified that he incorrectly believed that he was entitled to ninety days of FMLA leave. Elaborating, he testified that "[w]eekly I would go in person and ask for that information regarding what is my limit to my FMLA. After going to [Kersey's office] time after time, I left voicemails. When I didn't get responses to voicemails, I sent her emails. To this date I have received nothing." According to Reyer, he was first informed of the balance of FMLA time a "few weeks" before his termination. (Pl.'s Resp., Ex. A, Reyer Dep. 56:11-59:6.)

### H.  Events Subsequent to Reyer's Termination

A note from Dr. Kimzey dated December 23, 2010 and addressed "To Whom it may concern" states that Reyer would not be subject to the five pound lifting restriction once his antibiotic PICC line treatment was completed, "which is tentatively due to be January 16, 2016." (Pl.'s Resp., Ex. P.)

Reyer testified that he did not provide this note to St. Francis prior to his termination. Reyer explained that he obtained the December 23, 2010 note to submit in connection with his unemployment proceedings. A note in Dr. Kimzey's records related to Reyer's office visit on

---

[6] Reyer contends that there is sufficient evidence in the record to dispute Defendants' assertion that his FMLA leave expired on August 22, 2013. In support, he emphasizes the fact that Kersey could not remember the exact date on which his FMLA time expired. Additionally, Reyer urges that a jury could find the timesheets inaccurate or incredible because they were created for litigation. Beyond Chapman's testimony, Reyer, however, does not cite to any evidence that calls into question the accuracy of the timesheets., Although I am not entirely persuaded by Reyer's argument, for the purposes of this motions, there is sufficient evidence – although just barely so – to create a genuine issue of material fact as to the date on which Reyer exhausted his FMLA leave.

December 23, 2013 states "Not back to work, but was in fact released from previous job. Needs letter written for unemployment today." (Defs.' Statement of Undisputed Material Facts ¶¶ 110-113.) Reyer's PICC line was removed on January 10, 2014 following the completion of the sixty-day course of antibiotics. (Id. at ¶ 77.)

On March 18, 2014, St. Francis hired Bruce Millar to replace Reyer. Millar dated his employment application January 24, 2014 and stated that he could begin work "ASAP or 1/27/2014." Millar was hired to do maintenance work three days a week and security work two days a week. ((Pl.'s Resp., Exs. G, S; Ex. C, Hedges Dep. 58:11-17.)

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." (Id. at 322).

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

Defendants have moved for summary judgment on all claims asserted in Reyer's First Amended Complaint.

### A. FMLA Claims

"The FMLA entitles eligible employees to take twelve weeks of leave during any twelve-month period for the employee's own 'serious health condition that makes the employee unable to perform the functions' of his or her job." Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 317-18 (3d Cir. 2014) (quoting 29 U.S.C. § 2612(a)(1)(D)). Following this leave, an employee is entitled to be restored to his original position or an equivalent position. 29 U.S.C. § 2614(a)(1). However, when an employee cannot perform an essential function of the original position due to the "continuation of a serious health condition," the right to restoration does not exist. 29 C.F.R. § 825.216(c). Additionally, as a condition of restoration for an employee who has taken leave for his own serious medical condition, an "employer may have a uniformly applied practice or

policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work." 29 U.S.C. § 2614.

The FMLA contains "two relatively distinct provisions." Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). First, an employer is prohibited from taking action "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). A claim arising under section 2615(a)(1) is known as an "interference" claim. Callison, 430 F.3d at 119. Second, the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). A claim under section 2615(a)(2) is referred to as a "retaliation" or a "discrimination" claim. Callison, 430 F.3d at 119. Defendants have moved for summary judgment on Reyer's FMLA interference and retaliation claims.

### i. Interference

In order to make out a claim for interference under the FMLA, a plaintiff must establish that "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014) (quoting Johnson v. Cmty. Coll. of Allegheny Cnty., 566 F. Supp. 2d 405, 446 (W.D. Pa. 2008)).

Defendants argue that Reyer's FMLA interference claim fails because there is no evidence that St. Francis ever denied Reyer the benefits he was entitled to receive under the FMLA. Defendants note that Reyer requested and received FMLA leave in 2011, 2012 and 2013

and that, each year, he exceeded the twelve weeks he was entitled to receive. Defendants urge that Reyer's claim for interference also fails because he never provided St. Francis with documentation from his physician certifying that Reyer was able to return to work and the undisputed evidence shows he was unable to perform the essential functions of the job at the time his FMLA expired. As such, Defendants contend that Reyer has failed to demonstrate that he was entitled to reinstatement to the same or equivalent position under the FMLA.

Proceeding under a somewhat different theory, Reyer argues that he has offered sufficient evidence to withstand summary judgment on his interference claim on the basis that Defendants failed to provide him with adequate notice under the FMLA. Specifically, he urges that the evidence establishes that he was never (1) provided with written notice that his leave was being designated as FMLA leave – i.e. a "designation notice," (2) informed "of his balance of FMLA time" or (3) informed that he would be terminated if he failed to provide documentation from a physician certifying that he could return to work without restrictions. Reyer urges that these failures prevented him from making informed decisions about his leave such as whether or not he wanted to have the PICC line inserted.

The FMLA mandates that employers provide employees with "both general and individual notice about the FMLA." Lupyan, 761 F.3d at 318. To satisfy the general notice requirements, an employer must post a notice setting forth employees' FMLA rights on its premises and provide employees with information about the employer's FMLA policies in a handbook or an equivalent publication. 29 U.S.C. § 2619(a), 29 CFR § 825.300.

Regarding the individual notice requirement, once an employer is aware that an employee is taking FMLA-qualifying leave, the employer must:

> (1) within five business days notify the employee of his or her eligibility to take FMLA leave, 29 C.F.R. § 825.300(b)(1); (2)

> notify the employee in writing whether the leave will be designated
> as FMLA leave, 29 C.F.R. § 825.300(d)(1); (3) provide written
> notice detailing the employee's obligations under the FMLA and
> explaining any consequences for failing to meet those obligations,
> § 825.300(c)(1); and (4) notify the employee of the specific
> amount of leave that will be counted against the employee's
> FMLA leave entitlement, § 825.300(d)(6).

Lupyan, 761 F.3d at 318. Failure to provide an employee with this notice can constitute a claim for interference. Id. (citing Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 144 (3d Cir. 2004)). In order for such a claim to be actionable, a plaintiff must show that the "failure to advise rendered him unable to exercise [his FMLA rights] in a meaningful way, thereby causing injury." Conoshenti, 364 F.3d at 143.

Viewed in the light most favorable to Reyer, evidence in the record could support a conclusion that Reyer informed Defendants that he was taking FMLA-qualifying leave triggering Defendants' obligation to provide him with the individual notice required under the FMLA. Reyer also testified that he repeatedly requested but never received information regarding the amount of FMLA time he had taken. Kersey also testified that she never provided Reyer with a designation notice. As Defendants have not challenged this failure to advise theory, Defendants' motion for summary judgment on the interference claim will be denied.

### ii.  Retaliation[7]

"FMLA retaliation claims are rooted in the FMLA regulations." Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014). "They prohibit an employer from

---

[7] In his response in opposition to the motion for summary judgment, Reyer addressed his ADA and FMLA retaliation claims together. In doing so, he conflated the evidence and arguments he contends support the two claims. However, at least in part, the FMLA and ADA retaliation claims involve somewhat different protected activity. Reyer's decision to treat the claims together makes it somewhat difficult to understand his arguments. Nonetheless, I have attempted to parse the evidence on which Reyer relies and have given separate treatment to the claims.

'discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.'" Id. (quoting 29 C.F.R. § 825.220(c)).

In the absence of direct evidence, as is the case here, FMLA retaliation claims are assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).[8] Under that framework, the plaintiff has the initial burden of establishing a prima facie case. To do so in the FMLA retaliation context, a plaintiff must show that: (1) he took FMLA leave; (2) he suffered an adverse employment decision; and (3) the adverse decision was causally related to that leave. Conoshenti, 364 F.3d at 146.

If the plaintiff presents a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision. Lichtenstein, 691 F.3d at 302. If the defendant meets this "minimal burden," "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir. 1994).

### 1. Prima Facie Case – Causal Connection

Defendants urge that Reyer cannot establish a prima facie case of retaliation because he cannot demonstrate a causal link between his taking FMLA leave and his termination.

Courts generally focus on "two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." Abramson v. William Paterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001). First, courts may look at the timing of the adverse

---

[8] The parties agree that Reyer's FMLA retaliation claim should be analyzed under the McDonnell Douglas framework.

employment action. Id. "If the timing of the alleged retaliatory action is 'unusually suggestive of retaliatory motive' a causal link will be inferred." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). When a causal connection relies on temporal proximity alone, courts generally require that the termination occur within a few days of the protected activity. See, e.g., Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (holding that a causal link can be inferred where two (2) days passed between the employee's protected activity and the adverse employment action); Whitman v. Proconex, Inc., 2009 WL 141847, at *10-12 (E.D. Pa. Jan. 20, 2009) (finding that discharge within minutes of returning from FMLA leave was "unduly suggestive" of a causal link); Reinhart v. Mineral Techs. Inc., 2006 WL 4050695, at *10–11 (E.D. Pa. Nov. 27, 2006) (finding evidence that termination occurred within twenty-four (24) hours after returning from FMLA leave sufficient to survive summary judgment). Second, a court may infer causation where an employer engages in a continuous pattern of antagonism between the time an employee engaged in protected activity and the adverse employment action. Abramson, 260 F.3d at 288. Temporal proximity and evidence of antagonism "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Kachmar, 109 F.3d at 177.

According to Defendants, there is "no evidence of any antagonism from anyone at St. Francis" and Reyer cannot establish causation through evidence of temporal proximity alone. Defendants urge that proximity in this case should be measured from November 2011, the date on which Reyer first took FMLA leave, to December 2013 when St. Francis terminated Reyer's employment. Defendants urge that this two year lapse is much too lengthy to support an inference of causation. [9]

_____

[9] As noted above, Reyer lumped his FMLA and ADA retaliation claims together. In the section addressing causation, Reyer primarily discusses the temporal proximity between his request that

I disagree with Defendants' insistence that temporal proximity must be measured from Reyer's very first instance of protected activity. In support of their argument that the relevant date for measuring temporal proximity is November 2011 – the date on which Reyer first took FMLA leave, Defendants cite to Capps v. Mondelez Global LLC, 147 F. Supp. 3d 327(E.D. Pa. 2015). In that case, the district court stated that "[c]ourts measure temporal proximity from the first date on which the litigant engaged in his protected activity." Id. at 337. For this proposition, the district court in Capps relied on an unpublished Third Circuit case, Blakney v. City of Philadelphia, 559 Fed. Appx. 183 (3d Cir. 2014), wherein the court stated that "[w]e measure temporal proximity from the date on which the litigant first files a complaint." Id. at 186.

Unlike the case before me, the protected activity in Blakney was the filing of a formal complaint. Furthermore, other published Third Circuit precedent clearly recognizes that the temporal analysis can account for instances in which a plaintiff engages in multiple protected activities. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) (retaliatory action occurred "[s]everal months after [the plaintiff's] last protected activity" along with other evidence of antagonism is sufficient to allege a causal connection); Urey v. Grove City Coll., 94 F. Appx. 79, 81 (3d Cir. 2004) (analyzing temporal proximity based on last instance of protected activity); Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 332 (3d Cir. 2016) (same).

As noted above, for the purpose of this motion, I will consider December 23, 2013 as the date on which Reyer exhausted his twelve weeks of FMLA leave. As such, viewed in the light most favorable to Reyer, he was terminated on the day his FMLA leave expired and this timing could be considered "unduly suggestive." See, e.g, Parker v. Hanhemann Univ. Hosp., 234 F. Supp. 2d 478, 492 (D.N.J. 2002) ("the parties do agree that plaintiff was told that her job was

---

Defendants accommodate his five-pound lifting restriction and his termination. Requests for reasonable accommodations are not protected activity under the FMLA and, therefore, are irrelevant to the analysis of Reyer's FMLA retaliation claim.

eliminated the very day that she returned from FMLA leave. Such temporal proximity is 'unduly suggestive' and satisfies the causation element of plaintiff's prima facie case at the summary judgment stage").

Furthermore, there is no evidence in the record that Defendants considered whether Reyer was eligible for additional leave under the six month leave policy above and beyond his twelve-week FMLA leave. Viewing the evidence in the light most favorable to Reyer, a reasonable jury could conclude that Defendants' decision to terminate Reyer and not extend him the benefit of the six month leave policy was made in retaliation for his invocation of FMLA leave. [10] See Garrett v. Atlanticare Health Sys., Inc., 2009 WL 3446755, at *8 (D.N.J. Oct. 21, 2009) ("even if Plaintiff was not entitled to automatic reinstatement under the FMLA, the practical effect of the Defendant's Unprotected Leave Policy was to allow her certain rights to reapply. If that policy was implemented in a way intended to retaliate against Plaintiff for her invocation of FMLA leave, such conduct is not immunized simply because Defendant could have terminated her back on February 1st.")[11] For these reasons, I conclude that Reyer has

---

[10] A reasonable jury certainly could conclude otherwise. However, given the material issues of fact in the record before me, the ultimate decision as to Defendants' motivation for terminating Reyer's employment remains a question for a jury.

[11] Additionally, Defendants argue that Reyer cannot demonstrate causation because Reyer was not terminated for his exercise of his FMLA rights but, rather because, he never provided St. Francis with documentation certifying that he was able to return to work after exhausting his twelve weeks of FMLA leave, which is a prerequisite for reinstatement. Defendants present this argument in connection with the causation element of Reyer's prima facie case and also as one of their legitimate non-discriminatory reasons for terminating Reyer's employment. The Third Circuit has held that "the nature of retaliation claims distinctly focuses on the employer's conduct and motivations for termination. Therefore, an employee is not precluded—as a matter of law—from bringing a retaliation claim simply because she exceeded the twelve-week FMLA entitlement." Lupyan, 761 F.3d at 324–25. As such, I am not persuaded by Defendants' argument that Reyer's inability to return to work at the time he exceeded his twelve-week FMLA entitlement precludes inquiry into their subjective motivations or immunizes them from liability.

identified sufficient evidence, for purposes of withstanding summary judgment, to support causation.

### 2. Legitimate Non-Discriminatory Reason and Pretext

According to Defendants, they have proffered more than adequate information to demonstrate that Reyer was terminated for the following legitimate non-discriminatory reasons ("LNDR"): (1) Reyer had exhausted his FMLA leave prior to his termination, (2) the "indefinite" five-pound lifting restriction prevented Reyer from performing the essential functions of his job as a maintenance worker, and (3) they needed to find a replacement to prevent further overtime. Defendants urge that Reyer was terminated for all three reasons taken together. I agree with Defendants that they have met their "relatively light" burden at this stage of articulating a legitimate non-discriminatory reason for their decision to terminate Reyer's employment. See EEOC v. Aldi, Inc., 2008 WL 859249, at *17–18 (W.D.Pa. Mar. 28, 2008) (concluding that plaintiff's failure to perform essential functions of the job is a legitimate nonretaliatory reason for dismissal); Mills v. Temple Univ., 869 F. Supp. 2d 609, 628 (E.D. Pa. 2012) (same).

As such, the burden shifts back to Reyer to demonstrate pretext. Defendants contend that Reyer has failed to offer any evidence from which a reasonable fact finder could disbelieve the Defendants' articulated non-discriminatory reasons or believe that discrimination was more likely than not a motivating or determinative factor.

### a. LNDR 1 – Expiration of FMLA Leave Time

Reyer responds that a jury could disbelieve the first reason Defendants identify because Defendants "refused" to tell Reyer when his FMLA leave expired, Kersey could not provide the exact date on which his FMLA leave expired and Kersey, Chapman and Hedges gave inconsistent testimony regarding who terminated Reyer's employment.

Viewing this evidence in the light most favorable to Reyer, I agree that he has offered sufficient evidence upon which a reasonable fact finder could find Defendants' assertion that he was terminated because his FMLA leave time expired to be unworthy of credence.

As discussed above in the context of causation, St. Francis maintained a "leave of absence" policy which allowed employees to take six months of leave for medical reasons. The handbook explains that the "leave of absence" policy applies to a period "beyond the twelve (12) weeks of the family leave policy." Nothing in the record establishes that Reyer was afforded the protections of St. Francis' "leave of absence" policy or that Defendants considered whether Reyer was entitled to its protections prior to terminating his employment.

As such, a reasonable jury could infer that Defendants' decision to terminate Reyer's employment because his FMLA leave expired was pretextual in light of their failure to consider Reyer's eligibility for additional leave under the more generous "leave of absence" policy. See Poff v. Prudential Ins. Co. of Am., 911 F. Supp. 856, 861 (E.D. Pa. 1996) ("an employer's failure to follow procedure assists a plaintiff's case if such violation, in conjunction with other evidence (such as evidence showing that the policy was disparately applied), tends to show that the proffered reason is not credible.")

Furthermore, Reyer testified that, despite repeated email, phone, and in person inquires, Defendants failed to provide him with information about the "balance" of his FMLA leave until shortly after his termination. If believed, a fact finder could conclude Defendants' repeated failure to inform Reyer of the balance of his time to be relevant to the pretext inquiry insofar as it could cast doubt on Defendants' assertion that they were merely concerned with the orderly application of employees' rights under the FMLA. That said, I disagree with Reyer that Kersey's inability to recall the exact date on which Reyer's FMLA leave expired is not in and of itself,

either directly or circumstantially, probative of discrimination. Reyer has not explained how Kersey's minor gap in recall is relevant.

Lastly, the inconsistent testimony regarding who discussed and who ultimately made the decision to terminate Reyer could somewhat undermine all three non-discriminatory reasons offered by Defendants. While a reasonable jury certainly could decide that this inconsistency is the product of the passage of time, it is also possible that a jury could conclude that Kersey and Hedges were attempting to obscure their involvement or deflect blame because they were taking an unlawful action. Although this inconsistency standing alone is unsufficient to carry Reyer's burden of demonstrating pretext, see Proudfoot v. Arnold Logistics, 2015 WL 5881530 (3d Cir. Oct. 8, 2015) ("slight inconsistencies as to who made the ultimate decision to terminate Proudfoot do not demonstrate that the reason provided for his termination was pretextual"), based on the entire record before me, I conclude that these facts cannot be ignored.

For the foregoing reasons, I conclude that Reyer has pointed to sufficient evidence – albeit barely so – to demonstrate that Defendants' first non-discriminatory reason was pretextual. In making this conclusion, I have also considered the evidence he offered in support of his prima facie case. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) ("evidence supporting [a] prima facie [retaliation] case is often helpful in the pretext stage and nothing about the McDonnell Douglas formula requires us to ration the evidence between one stage or the other.").

**b.  LNDR 2 – Inability to Perform Essential Functions**

Next, Reyer contends that a jury could disbelieve Defendants' assertion that he was terminated because he was unable to perform the essential functions of his job following the expiration of his FMLA leave. As discussed below in the context of Reyer's ADA claim, there

are genuine issues of material fact as to what the "essential functions" of the Maintenance Worker position were. Therefore, whether Reyer could perform those functions at the time of his termination also remains an unresolved question. As such, it would be inappropriate to conclude that Reyer is unable to refute Defendants' assertion that he was terminated for his alleged inability to perform certain essential functions of his job.

That said, even assuming that Reyer was not able to perform the essential functions of his job and, therefore, not entitled to reinstatement, this fact in and of itself would not insulate Defendants from liability if unlawful considerations nonetheless animated their decision to terminate Reyer's employment. See Donald v. Se. Pennsylvania Transp. Auth. (SEPTA), 2014 WL 3746520, at *6 (E.D. Pa. July 29, 2014) ("the focus in retaliation cases is on the subjective motive of the employer. That [the defendant] may have had a legitimate basis for its employment decision is not a complete defense to a [FMLA retaliation claim]. While [the defendant] may generally be justified in terminating Plaintiff because she remained absent at the end of her FMLA leave, this does not necessarily preclude the finding that unlawful considerations may have nevertheless played a determinative role in the particular decision at issue.")

### c.  LNDR 3 – Avoidance of Further Overtime

I also conclude that Reyer has offered sufficient evidence upon which a reasonable fact finder could disbelieve Defendants' assertion that Reyer's employment was terminated in order to avoid further overtime charges and address understaffing concerns at St. Francis. In support, Reyer notes that Millar, his replacement, completed his employment application on January 24, 2014 but was not hired for another two months. In light of this delay, a reasonable jury could conclude that Defendants' assertion that Reyer was terminated because St. Francis needed to promptly resolve its understaffing issue to be unworthy of credence.

In sum, the evidence Reyer points to provides a sufficient basis on which a jury could infer that the three non-discriminatory reasons proffered by Defendants were pretext for discrimination. See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1071 (3d Cir. 1996) (generally, the determination of whether the reason given was pretextual should be left for the jury because a "finding of discrimination is at bottom a determination of intent"). Based on the foregoing, Reyer has established both a prima facie case of retaliation in violation of the FMLA and the existence of genuine issues of material fact regarding whether Defendants' proffered reasons for his termination were pretext. Defendants' motion for summary judgment on Reyer's FMLA retaliation claim will be denied.

**B.  ADA Claims**

Defendants have also moved for summary judgment on Reyer's discrimination, failure to accommodate and retaliation claims brought under the ADA.

**i.  Discrimination (Disparate Treatment)**

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112. In the absence of direct evidence, as is the case here, the McDonnell Douglas burden shifting framework applies to discrimination claims brought under the ADA. Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000).[12] That framework is laid out above in the context of Reyer's FMLA retaliation claim.

---

[12] The parties both assert and I agree that Reyer's ADA discrimination claim should be analyzed under the McDonnell Douglas framework. (Defs.' Mot. p. 15; Pl.'s Resp. p. 12.)

### 1.  Reyer's Prima Facie Case

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate: (1) that she is a disabled person within the meaning of the ADA; (2) that she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that she has suffered an otherwise adverse employment decision as a result of discrimination. Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998).

For the purposes of their summary judgment motion, Defendants do not contest that Reyer was disabled within the meaning of the ADA nor do Defendants dispute that Reyer was subjected to an adverse employment action – i.e., termination. (Defs.' Mot. p. 16 n.7.) It is the second element—whether Reyer was able to perform the essential functions of his job, with or without a reasonable accommodation—that Defendants urge Reyer cannot establish.

### a.  Essential Functions

A qualified individual is someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111. To determine whether a person is qualified, a two-part test is used: "[f]irst, a court must consider whether 'the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' and second, 'whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.'" Gaul, 134 F.3d at 580 (quoting 29 C.F.R. pt. 1630, App. at 353–54). The determination as to whether someone is qualified is made at the time of the employment decision. Gaul, 134 F.3d at 580.

"[W]hether a particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (quoting Deane v. Pocono Medical Ctr., 142 F.3d 138, 148 (3d Cir. 1998) (en banc)). The Equal Employment Opportunity Commission's regulations defining "essential functions" further state a function may be deemed "essential" because: (i) the reason the position exists is to perform that function; (ii) the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for her expertise or ability to perform the particular function. 29 C.F.R. § 1630.2(n)(2).

The regulations further set forth a non-exhaustive list of examples of evidence that may assist courts in identifying the "essential functions" of a job: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3); see also Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P., 257 F.3d 273, 279 (3d Cir. 2001) (discussing and applying the seven factors). "[N]one of the factors nor any of the evidentiary examples alone are necessarily dispositive." Skerski, 257 F.3d at 279.

Defendants urge that Reyer cannot establish that he was qualified for the Maintenance Work III position at the time of his termination because he was unable to perform the essential functions of the position, without or without reasonable accommodations, in light of the five-

28

pound lifting restriction. Although Defendants are not entirely consistent as to the exact nature of the essential function they contend Reyer could not perform, it appears that they are arguing that lifting more than fifty pounds was an essential function of the job.[13] After reviewing the record, I conclude that there are genuine issues of material fact regarding whether lifting fifty pounds was an essential function of the Maintenance Worker position.

The job description for the Maintenance Worker position identifies the following as a "physical . . . requirement": "must be able to lift in excess of 50 pounds, push, pull and move residents, equipment, supplies, etc., up to 200 pounds." (Defs.' Mot., Ex. 10.)[14] According to Hedges, lifting items in excess of 50 pounds was a "true assessment" of the Maintenance Worker position. (Defs.' Mot. Ex. 5, Hedges Dep. 83:17-83:23.)

Although lifting fifty pounds is identified in the job description and Hedges verified its inclusion as a "true assessment" of the position, neither fact is conclusive. See Deane, 142 F.3d at 148 (declining to apply "conclusive effect to either the job description or [the employer's] judgment as to whether heavy lifting is essential to [plaintiff's] job"). The applicable regulations,

---

[13] Portions of Defendants' motion can be read as suggesting that lifting in general or lifting more than five pounds was an essential function of the Maintenance Worker position. However, the vast majority of Defendants' argument and factual assertions in connection with the issue focus on lifting in excess of fifty pounds. (See Defs.' Mot. p. 17; Defs.' Statement of Undisputed Facts ¶¶ 22-23, 30.) Additionally, in the context of Reyer's ADA claims, Defendants explicitly state – at least once – that lifting fifty pounds was an essential function of the job.

[14] For purposes of this analysis, "requirements" of a position may be distinguishable from the "essential function(s)" of that position. See e.g., Skerski, 257 F.3d at 280 ("describing climbing as a requirement is not necessarily the same as denominating climbing as an essential function); Acevedo v. City of Philadelphia, 680 F. Supp. 2d 716, 733 (E.D. Pa. 2010) ("A distinction must be made between the requirements of a given position and the essential functions of that position").

While lifting more than 50 pounds is identified as a physical requirement of the job, I note that lifting objects – in excess of fifty pounds or otherwise – does not appear in the section of the job description captioned "Purpose of Your Job Position."

statutes and precedent instruct that I look to all of the evidence in the record in making the assessment.

During the relevant time period, St. Francis generally employed five Maintenance Workers. The limited number of available employees among whom lifting objects in excess of fifty pounds could be distributed supports Defendants' argument. See 29 C.F.R. § 1630.2(n)(2). However, nothing in the record establishes the frequency with which Maintenance Workers were required to lift objects in excess of fifty pounds or how much time was devoted to such tasks on an average day.[15]

Although Reyer acknowledged that lifting objects in excess of fifty pounds was listed in the job description, he did not testify how frequently he lifted objects of that weight. Additionally, besides Reyer's statement that he was previously subject to a no-lifting restriction and then later, a twenty-five pound lifting restriction, nothing in the record speaks to the lifting experience of other Maintenance Workers employed during or before Reyer's employment at St. Francis.

Viewed in the light most favorable to Reyer, the record does not suggest that the reason the Maintenance Worker position existed was to lift objects in excess of fifty pounds or that Reyer was hired for his expertise in lifting objects in excess of fifty pounds.

Additionally, viewed in the light most favorable to Reyer, the record could support a conclusion that lifting objects in excess in fifty pounds may be a means for carrying out an essential function of the Maintenance Worker position rather than the essential function itself. I

---

[15] Chapman testified that Maintenance Workers were required to lift more than <u>five</u> pounds "[e]very day, many times during the day" (Defs.' Mot., Ex. 2, Chapman Dep. 35:2-5.) However, as explained above, a fair reading of Defendants' submissions indicates that they contend that lifting more than <u>fifty</u> pounds is an "essential function" of the job. As such, Chapman's testimony regarding the frequency with which Maintenance Workers were required to lift more than five pounds is irrelevant to the current essential functions analysis.

note that "the essential function requirement focuses on the desired result rather than the means of accomplishing it." Skerski, 257 F.3d at 280. For example, "in a job requiring the use of a computer, the essential function is the ability to access, input, and retrieve information from the computer. It is not essential that the person be able to use the keyboard or visually read the computer screen" Id. at 281. As such, there is an issue as to whether lifting objects in excess of fifty pounds is the means of accomplishing a task rather than a desired result.

In conclusion, at least some of the factors identified in 29 C.F.R. § 1630.2(n)(2) support a conclusion that lifting fifty pounds was not an essential function of the Maintenance Worker position. Given that genuine issues of material fact exist, it would be inappropriate to conclusively resolve this question. See Skerski, L.P., 257 F.3d at, 280 ("consideration of the seven evidentiary examples included in § 1630.2(n)(3) suggests caution against any premature determination on essential functions [when] at least some of them lean in [a plaintiff's] favor.") The issues I have identified must be resolved by a jury. See Turner, 440 F.3d at 614 ("the fact issue as to 'essential function' must be decided by a jury").

### b.  Reasonable Accommodation

As noted above, the question is not merely whether Reyer could perform the essential functions of his job but rather could Reyer perform the essential functions with or without a reasonable accommodation. "As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question." Id. at 614–15.

Because factual questions remain as to whether lifting objects in excess of fifty pounds was an essential function of the Maintenance Worker position, I am unable to determine that Reyer was incapable of performing the essential functions of his job with or without a reasonable accommodation. See, e.g., Acevedo, 680 F. Supp. 2d at 738 (recognizing that where a genuine

issue of material fact remains regarding the essential function(s) of a position, courts are prevented from addressing the issue of whether a plaintiff could perform those function(s) with or without a reasonable accommodation).[16]

### ii.  Failure to Accommodate

The adverse employment decisions barred by the ADA include "not only adverse actions motivated by prejudice and fear of disabilities, but also . . . failing to make reasonable accommodations for a plaintiff's disabilities." Mercer v. Se. Penn. Transit Auth., 26 F. Supp. 3d 432, 440 (E.D. Pa. 2014) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999). As such, "[a]n employer's failure to reasonably accommodate the disabilities of an otherwise qualified employee constitutes an adverse employment action under the third element of the prima facie case of generic disability discrimination." Sharbaugh v. W. Haven Manor, LP, 2016 WL 6834613, at *8 (W.D. Pa. Nov. 21, 2016).

More specifically, "the ADA defines discrimination to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" Mercer, 26 F. Supp. 3d at 440 (quoting 42 U.S.C. § 12112(b)(5)(A)). The ADA further states that discrimination includes "denying employment opportunities to [an] … employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee[.]" 42 U.S.C. § 12112(b)(5)(B).

---

[16] Because the same burden shifting scheme applies in the context of Reyer's FMLA retaliation, ADA disparate treatment and ADA retaliation claims, the analysis of Defendants' non-discriminatory reasons and Reyer's showing of pretext are the same for all three claims. Accordingly, my analysis from the FMLA retaliation discussion applies in the context of Reyer's ADA disparate treatment and ADA retaliation claims.

Notably, failure to accommodate claims "do not require that an employer's action be motivated by a discriminatory animus directed at the disability and, therefore, the McDonnell Douglas test does not apply." Sharbaugh, 2016 WL 6834613, at *7; see also Allen v. Verizon Pennsylvania, Inc., 418 F. Supp. 2d 617, 622 (M.D. Pa. 2005).

To establish that an employer breached its duty to provide a reasonable accommodation, a plaintiff must demonstrate: (1) that he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated. Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006); Taylor, 184 F.3d at 319–20.

A qualified individual has the burden of identifying an accommodation whose costs do not clearly exceed its benefits. Walton v. Mental Health Ass'n of Southeastern Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999). Summary judgment may be granted for a defendant only "in cases in which the plaintiff's proposal is either clearly ineffective or outlandishly costly." Id. (citations omitted). "If the plaintiff satisfies his or her burden, the defendant then has the burden to demonstrate that the proposed accommodation creates an 'undue hardship' for it. The ADA defines 'undue hardship' as 'an action requiring significant difficulty or expense, when considered in light of [a series of factors].' Among the factors to be considered are 'the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility.'" Id. (quoting 42 U.S.C. § 12111(10)(A)(B)).

"Reasonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith under what has been termed a duty to engage in the 'interactive process.'" Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004). "Once an accommodation is requested, the

employer is required to engage in the interactive process during which the employer and employee identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome them." Bielich v. Johnson & Johnson, Inc., 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014); Armstrong, 438 F.3d at 246 ("if an employer has adequate notice of an employee's disability, and the employee requests accommodations for the disability, it becomes the responsibility of the employer to engage the employee in the interactive process of finding accommodations"); see also 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). More specifically:

> The interactive process is aimed at determining what reasonable accommodations, if any, can address the employee's disability. The interactive process requires a great deal of communication between the employee and the employer, as both parties "bear responsibility for determining what accommodation is necessary. Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome A failure to communicate, either by way of initiation or response, may be an act of bad faith.

Sharbaugh, 2016 WL 6834613, at *9 (internal quotations and citations omitted); see also Williams, 380 F.3d at 776.

Defendants argue that the undisputed evidence demonstrates that they made a good faith effort to accommodate what they characterize as Reyer's requested "indefinite" five-pound lifting restriction. In support, Defendants assert that it is undisputed that (1) Reyer had many

conversations with Kersey about when he could return to work, (2) when presented with the five-pound lifting restriction on December 3, 2013, Kersey spoke to Hedges and Chapman to determine if such a restriction could be accommodated and (3) following "meaningful discussion" it was determined that no reasonable accommodation existed that would have allowed Reyer to fulfill the position's essential functions, including lifting items in excess of fifty pounds.

Contrary to Defendants' position, the foregoing factual assertions are disputed. Viewed in the light most favorable to Reyer, the evidence could reasonably support a conclusion that Defendants' representatives did not "meaningfully" discuss the lifting restriction either amongst themselves or with Reyer. I make this conclusion in light of the fact that Kersey testified that she could not recall whether she discussed the five-pound lifting restriction with Reyer. Similarly, Hedges and Chapman both testified that they never discussed the restriction with Reyer. Although Kersey claimed that she discussed the lifting restriction with Hedges and Chapman, Hedges could not recall having such a discussion. This is significant because unlike Kersey, Hedges had intimate knowledge about the daily routine and requirements of the Maintenance Worker's position. In light of this evidence, a reasonable jury could conclude that Defendants' response to the five-pound lifting restriction was limited and insufficient to satisfy their obligation to engage in the interactive process.

Furthermore, Defendants' characterization of the lifting restriction as "indefinite" is disputed. According to Defendants, Reyer provided them conflicting and confusing information about when he could return to work and never provided them with a date on which he would be able to return to work without the five-pound lifting restriction.[17] As such, they claim that they

_____

[17] In support of their "indefinite" argument, Defendants state that the last doctor note Reyer provided did not specify when the five-pound lifting restriction would end. Defendants assert

reasonably believed that the lifting restriction was "indefinite" and, relatedly, that Reyer's request for leave was "open-ended." Defendants note that indefinite leave is not a reasonable accommodation. See Krensavage v. Bayer Corp., 314 F. Appx. 421, 426 (3d Cir. 2008) ("it has been recognized that an open-ended disability leave is not a reasonable accommodation under the ADA where, as here, the plaintiff does not present evidence of the expected duration of her impairment"); Fogleman v. Greater Hazleton Health All., 122 F. Appx. 581, 586 (3d Cir. 2004) (a request for "indefinite and open-ended" leave "does not constitute a reasonable accommodation").

When viewed in the light most favorable to Reyer, there is sufficient evidence in the record to support a conclusion that Reyer's requested accommodations were not "indefinite" in nature. Reyer testified that he had discussions with Kersey and Hedges about how long his PICC line would be in. According to Reyer, prior to his termination, he told Kersey that he would have the five-pound weight restriction until the PICC line was removed sometime in early January.

If Reyer's testimony is credited, and at this stage it must, the requested accommodations – either in the form of a five-pound lifting restriction or additional leave – were not indefinite or open-ended because both would have ended in early January. A request or a leave of absence may constitute a reasonable accommodation. Id. at 585 ("In some instances, it may be possible for a requested leave of absence to constitute a reasonable accommodation"). Additionally, if Defendants were uncertain as to the duration of the lifting restriction or his request for leave, a

---

that had Reyer provided them with the December 23, 2013 note, which indicated that the lifting restriction would end by mid-January, Reyer "may have had a colorable argument to defeat summary judgment [on the ground that] a finite period of medical leave may represent a reasonable accommodation." (Defs' Mot. p. 18 (emphasis in original)). As noted above, Defendants' argument entirely overlooks Reyer's own testimony and as well as their own obligations under the ADA.

reasonable jury could conclude that Defendants failed to engage in good faith and did not attempt to clarify ambiguous information with Reyer.

Viewed in the light most favorable to Reyer, the foregoing evidence is sufficient to permit a reasonable jury to conclude that Defendants failed to fulfill their obligation to participate in the interactive process. Additionally, there are genuine issues of material fact as to whether the proposed accommodations were reasonable and would have enabled Reyer to perform the essential functions of his job. For these reasons, summary judgment with respect to Reyer's failure to accommodate/interactive process claim is not appropriate.

### C.  Retaliation

Under the ADA, "it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA." Williams, 380 F.3d at 758–59 (citing Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003)). A retaliation claim under the ADA follows the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Williams, 380 F.3d at 760 n.3.

Defendants present a single argument for why they are entitled to summary judgment on Reyer's ADA retaliation claim. Defendants urge that Reyer cannot meet his burden of establishing that their professed reasons for terminating his employment were pretext for disability discrimination. As discussed above in the context of Reyer's FMLA retaliation claim, genuine issues of material fact exist as to whether Defendants' legitimate non-discriminatory reasons for Reyer's termination were merely pretext. As such, summary judgment on Reyer's ADA retaliation claim will also be denied.

**IV.** **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment will be denied. An appropriate order follows.